JASON R. MAIER, ESQ.
Nevada Bar No. 8557
DANIELLE J. BARRAZA, ESQ.
Nevada Bar No. 13822
**MAIER GUTIERREZ & ASSOCIATES**
8816 Spanish Ridge Avenue
Las Vegas, Nevada 89148
Telephone: 702.629.7900
Facsimile: 702.629.7925
E-mail:     jrm@mgalaw.com
            djb@mgalaw.com

*Attorneys for Plaintiff Rachell A. Jacobson*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| RACHELL A. JACOBSON f/k/a RACHELL A. RHEIN, individually,<br><br>Plaintiff,<br><br>vs.<br><br>PETERSON DENTAL GROUP, P.C., f/d/b/a CRESSMAN DENTAL GROUP P.C., a domestic professional corporation; INTERDENT SERVICE CORPORATION, a foreign corporation; DOES I-X; and ROE BUSINESS ENTITIES I-X, inclusive,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff RACHELL A. JACOBSON, formerly known as RACHELL A. RHEIN ("Plaintiff"), by and through her attorneys of record, the law firm MAIER GUTIERREZ & ASSOCIATES, hereby demands a trial by jury and complains and alleges against her former joint employers, PETERSON DENTAL GROUP, P.C., formerly doing business as CRESSMAN DENTAL GROUP P.C. ("Peterson Dental Group"); INTERDENT SERVICE CORPORATION ("InterDent"); and DOES I-X; and ROE BUSINESS ENTITIES I-X, inclusive (collectively, "Defendants") as follows:

/ / /

1

**JURISDICTION, VENUE, AND LEGAL BASIS FOR THIS ACTION**

1.    This Court possesses jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343 for the federal law claims, as Plaintiff's claims arise under the Americans with Disabilities Act of 1990 ("ADA") 42 U.S.C. §§ 12101 *et seq*., and the Americans with Disabilities Act Amendments Act ("ADAAA"), and supplemental jurisdiction under 28 U.S.C. § 1367.

2.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because "a substantial part of the events or omissions giving rise to the claim[s] occurred" in Nevada.

**PARTIES AND "JOINT EMPLOYER" RELATIONSHIP OF DEFENDANTS**

1.    Plaintiff RACHELL A. JACOBSON ("Plaintiff") is, and at all times pertinent hereto was, a resident of Clark County, Nevada.

2.    Upon information and belief, defendant PETERSON DENTAL GROUP, P.C., formerly doing business as CRESSMAN DENTAL GROUP PC is, and at all times pertinent hereto was, a domestic professional corporation authorized to conduct business in Clark County, Nevada.

3.    Upon information and belief, defendant INTERDENT SERVICE CORPORATION is, and at all times pertinent hereto was, a foreign corporation authorized to conduct business in Clark County, Nevada.

4.    On her W-2 that Plaintiff received from Defendants, the employer's name is listed as: Cressman Dental Group, P.C., which defendants' counsel has represented now goes by Peterson Dental Group, P.C.

5.    On Plaintiff's W-2 that she received from Defendants, the employer's address is listed as: 9800 S. La Cienega Blvd.. Ste. 800, Inglewood, CA 90301, which was an address used by Interdent Service Corporation.

6.    Throughout her employment with Defendants, Plaintiff worked at various "Gentle Dental" locations (under the umbrella of both Cressman Dental Group, P.C., now doing business as Peterson Dental Group, P.C. and Interdent) in Clark County, Nevada.

3.    With respect to this matter, Interdent is not a mere "parent" entity to Peterson Dental Group.  Rather, Interdent was actively involved in and had control over the terms and conditions of Plaintiffs' employment.  Specifically, all of the individuals responsible for reviewing Plaintiff's

2

request for reasonable medical accommodations had "Interdent" work email addresses and were employed by Interdent. This includes Megan Alapati, who is listed as the "Interdent" Director of Operations for Nevada.  This also includes Christopher Alves, who is listed as the "Interdent" Director of Human Resources. The decision to subject Plaintiff to a retaliatory hostile work environment which became so toxic that Plaintiff ended up constructively was not made solely by Peterson Dental Group, but was made in conjunction with Interdent, which had direct control, approval, and involvement over that decision.

4.     Interdent directly participated in and influenced the employment policies of Peterson Dental Group when it came to Plaintiff specifically, and this is substantiated by email communications between the parties.

5.     As such, with respect to this matter, Peterson Dental Group and Interdent were "joint employers" of Plaintiff, as that term is recognized in Title VII matters.

6.     Plaintiff is not familiar with the complex corporate interrelationships through which the named defendants PETERSON DENTAL GROUP and INTERDENT jointly operate their Clark County, NV locations, which is where Plaintiff was employed.  Thus, the true names and capacities, whether individual, corporate, subsidiary, associate, partnership, joint ventures or otherwise, of these fictitious (additional) defendants herein designated as DOES I through X and ROE CORPORATIONS I through X, inclusive.  Their identities and names are unknown to Plaintiff at this time, who therefore sues these defendants by fictitious names.

7.     These fictitious defendants, acting with or at the discretion of the named Defendants, may also be responsible and therefore liable for the injurious conduct or illegal conduct which harmed Plaintiff. Plaintiff will seek leave of the Court to insert the true names and capacities of such Defendants when the same have been ascertained and will further seek leave to join said Defendants in these proceedings.

7.     Defendants engage in activities which affect interstate commerce, and they employed more than 15 employees in the timeframes required and thus are subject to both the Nevada statutes and federal statutes prohibiting discrimination.

/ / /

3

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

8.    On or about March 20, 2024, Plaintiff filed a formal Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Nevada Equal Rights Commission ("NERC").  This filing fulfilled Plaintiff's obligation to initiate an administrative claim before seeking review in this Court.

9.    In her Charge of Discrimination, Plaintiff alleged facts demonstrating that she had been discriminated against based on her disability, and retaliated for participating in protected activity.

10.    On or about May 21, 2025, the EEOC issued Plaintiff a "Notice of Rights" letter stating that she would have within 90 days of the letter's receipt to file suit.  *See* **Exhibit 1**, Notice of Rights Letter.

11.    Plaintiff has met all administrative prerequisites to bring this lawsuit and has timely filed this lawsuit within 90 days of receiving her Determination and Notice of Rights Letter.

**GENERAL ALLEGATIONS APPLICABLE TO ALL CLAIMS**

**AT ALL RELEVANT TIMES, PLAINTIFF HAD A SUSTAINED DISABILITY WHICH REQUIRED REASONABLE ACCOMMODATIONS**

12.    On or around July of 2019, Plaintiff was hired by Defendants as a dental hygienist.

13.    At all relevant times, Defendants were a private joint employer with 15 or more employees.

14.    Throughout her employment with Defendants, Plaintiff performed her job duties as a dental hygienist diligently and with dedication.

15.    In 2023, Plaintiff sustained a chronic physical impairment to her left elbow/arm which substantially limited major life activities with respect to the ability to lift and use her left arm, specifically stemming from difficulties she had recovering from surgery following a motor vehicle accident.

16.    Plaintiff made a genuine effort to manage her medical condition and injuries.

17.    Plaintiff was qualified to perform the essential functions of her job position with reasonable accommodations that were supposed to be provided by Defendants, including but not limited to: providing Plaintiff with an assistant to perform non-hygienist essential tasks such as

4

adjusting the light, opening drawers, etc.; and limiting her number of patients that Plaintiff saw while she was experiencing severe and sustained physical impairments to her left elbow/arm.

**DEFENDANTS DISCRIMINATE AGAINST PLAINTIFF BASED ON HER DISABILITY AFTER SHE RETURNS FROM FMLA LEAVE AND SEEKS REASONABLE ACCOMMODATIONS**

18.    On or about June 1, 2023, Ms. Jacobson notified Defendants' Human Resources division that she was set to have surgery on June 22, 2023, and would need FMLA and short-term disability paperwork.

19.    In June 2023, Plaintiff properly filled out and provided all short-term disability paperwork to Defendants and/or the benefit provider, Lincoln Financial.

20.    In June 2023, Plaintiff properly provided all appropriate FMLA paperwork to Defendants prior to her surgery.

21.    In June 2023, Defendants notified Plaintiff that her FMLA leave was approved, with the leave set to start on June 22, 2023, and the return-to-work date set for "on or near" August 22, 2023.

22.    On or about June 22, 2023, Plaintiff had surgery.

23.    Plaintiff had expected her short term disability to kick in as of July 6, 2023. As that eligibility date was approaching, Plaintiff contacted her benefit provider Lincoln Financial, and learned that her short term disability benefits were denied due to her average working hours being reported to them as only being 28 hours/ week. As such, Plaintiff purportedly did not qualify for the disability benefit plan she had been paying into due to allegedly working only 28 hours per week instead of the mandatory 30+ hours per week.

24.    Upon information and belief, Plaintiff was not put on notice of the qualifying criteria or formula to determine short-term disability eligibility.

25.    Upon information and belief, Defendants intentionally calculated Plaintiff's work hours in an arbitrary and punitive manner specifically designed to prevent Plaintiff from qualifying for disability benefits.

26.    The denial of short term disability caused severe financial problems for Plaintiff and forced Plaintiff to ask her physician for a release-to-work earlier than her original planned return date

of August 22, 2023, so that she could provide for herself, her family, and her bills.

27.    On or about July 7, 2023, Plaintiff visited her physician at Advanced Orthopedics & Sports Medicine, where her arm was evaluated.  Following that examination, Advanced Orthopedics & Sports Medicine issued a letter indicating Plaintiff would be released to work on July 19, 2023.

28.    On or about July 17, 2023, Plaintiff submitted the return-to-work paperwork to Defendants, and specifically indicated: "I am returning earlier than planned due to the denial of my paid for Short Term Disability Benefit."

29.    On or about July 19, 2023, Plaintiff returned to work prematurely and without any medical accommodations, which unfortunately led to her experiencing physical set-backs in her recovery from surgery which substantially limited her major life activities and the ability to do many of her hygienist duties on her own.

30.    After it became clear that Plaintiff was physically struggling with conducting her job duties, Plaintiff went back to her physician on or about July 25, 2023, which led to a documented request for Plaintiff to be placed on light-duty at work.

31.    On or about July 25, 2023, in an internal email circulated amongst various HR and upper-management representatives, Defendants acknowledged that Plaintiff was being placed on light duty, stating as follows:

> Rachell has been placed on light duty effective 7/25/2023, a dr. note was submitted today.  We have attached a copy of the Dental Hygienist job description so you can review it along with the work restrictions.  Please review both and respond to this email to confirm if you can accommodate their light duty capacity beginning immediately AND complete the action items listed below.
>
> Work Restrictions effective 7/25/2023 (anticipated to last up to 30 days):
>
> 7. No lifting or carrying more than 10 pounds
>
> 8. No heavy carrying, no lifting, no pushing or pulling
>
> 9. No use of ladders
>
> 10. Allow breaks as needed during flare-ups of medical condition

32.    The July 25, 2023, internal email also asked Plaintiff's management team to reply if

these restrictions can be accommodated.

33. On July 26, 2023, Plaintiff's manager Glenda Olea promptly responded to the internal email, stating that she had spoken to Plaintiff, whose "biggest problem is pulling (adjusting light, reaching out for suction and opening draws)" and that "this can be solved by having Taylor as her assistant at all times."

34. Glenda Olea's July 26, 2023 email also mentioned that "allowing breaks as needed during flare ups will be solved by having a one column schedule and limiting SRPs [scaling and root planning procedures] to one in the am and one in the pm."

35. As such, a reasonable and feasible accommodation plan was put into place and agreed-upon by Defendants and Plaintiff, which would involve Plaintiff having an assistant at all times, and being limited to only a one column schedule which would lighten her workload and allow for enough breaks.

36. Defendants then proceeded to violate that accommodation agreement.

37. Defendants failed to provide Plaintiff with an actual dental assistant.

38. Defendants continuously violated the "one column" patient agreement as well which led to Plaintiff being unable to take breaks to manage her flare-ups and her physical condition only worsened.

39. Plaintiff was not actually put on light duty in practice. She was placed on light duty on paper and then Defendants continually harassed Plaintiff about what a problem it would be to provide her with the agreed-upon accommodations because the company did not want to reschedule patients and lose production (as it also refused to hire another dental hygienist during this time to make up for the other column). Plaintiff repeatedly raised these issues to Defendants, but Defendants failed to fix the problem.

**PLAINTIFF EXPERIENCES INCREASINGLY HOSTILE RETALIATION FROM DEFENDANTS**

40. On or about late July/ early August 2023, Defendants interfered with Plaintiff's medical restrictions by forcing her to participate in a mandatory meeting, but then telling her to clock out for that meeting, meaning she would not be getting paid it. Defendants apparently did this to make it look like a lunch break was taken when in actuality no such break was taken.

7

41. On or about August 2, 2023, Plaintiff emailed management about the time-card issue and asked for the 35-minute period to be counted as paid, since it was part of a mandatory meeting and there was no actual break.

42. On or about August 2, 2023, Plaintiff's manager Glenda Olea emailed Plaintiff that she was "sorry I instructed to post a 35 min lunch for July 27," and that she had asked payroll to correct it. In that same email, Ms. Olea also indicated that Plaintiff would now not be allowed to clock in to work until 7:45 a.m., even though she had been coming in at 7:30 a.m. and using that time before 8:00 a.m. patients to get everything ready. According to Ms. Olea, and without any input from Plaintiff, "I think 15 min is enough time to get ready for the day." This was obviously retaliatory in nature and meant to punish Plaintiff for reporting the interference with her ability to take actual breaks.

43. On August 2, 2023, Plaintiff emailed Ms. Olea, stating that "My agreement with previous managers was that I have a key and can come in at 7:30 to open the office and review my schedule prior to the mandatory 7:45-7:50 office huddle. It is unfortunate that you feel it appropriate to retaliate in anger because I questioned my legal right to being paid for a mandatory meeting."

44. Sadly, forcing Plaintiff to come in at 7:45 a.m. also meant that Plaintiff would have to rush to prepare for the morning patients (and risk further aggravating her recovering arm).

45. On or about August 31, 2023, with Plaintiff's arm only worsening and Plaintiff asking about if she could take some time off, Defendants' "Leaves" department emailed Plaintiff, saying she could take intermittent time off, and "we do not need to be notified. This is something you would discuss with your manager they can track the time you take off."

46. Plaintiff did take personal time off work in September 2023 due to her arm being overworked and Defendants not abiding by their agreement to provide her with an assistant and have her working one column per day.

47. Defendants agreed to give Plaintiff two weeks off in September 2023 so that she could rest her arm and then return to work.

48. When Plaintiff returned, the situation only got worse.

49. Text messages between Plaintiff and Megan Alapati in September 2023 reflect how incredibly overwhelmed Plaintiff was during this time, with Plaintiff relaying on September 26, 2023:

"So it's 8:50.  I have a patient available.  No room set up.  No assistant.  No communication.  Office manager has known for over a week I would be back today.  Don't know where instruments are.  No trays set up.  Was someone working here and left it like this?  I'll need to know who my assistant is tomorrow and moving forward."

50.    Megan Alapati responded to Plaintiff's concerns by saying "I will handle it now."

51.    But nothing was actually "handled," as the very next day Plaintiff again texted Ms. Alapati, "My 10am is here.  No one has communicated anything.  Am I suppose[d] to wander around and figure it out?" Plaintiff went on to state that "I know of 3 assistants willing to help me.  Yet I don't have one and no one has had the respect to communicate with me about it."  Plaintiff also specifically asked: "Is there a plan in place for me to have an assistant soon?  So I can plan to get my schedule back up to 2 columns?  It's kind [of a] collaborative effort to know I have an assistant by a certain date, and I can work to get my elbow ready to go for it."

52.    Ms. Alapati failed to substantively respond to Plaintiff's request for an update on when she would have an assistant.

**INTERDENT'S CORPORATE TEAM INTERFERES WITH PLAINTIFF'S ABILITY TO HAVE WORKPLACE ACCOMMODATIONS WHICH LEADS TO PLAINTIFF'S CONSTRUCTIVE DISCHARGE**

53.    Plaintiff obtained yet another medical return to work authorization form at the end of August 2023, which stated she was able to return to work as of October 6, 2023, but would need to be on light duty through January 6, 2024, which means "no heavy carrying, lifting, pushing, puling, ladders."  This documentation was provided to Defendants.

54.    Plaintiff spoke to Betty Valine at InterDent, and a plan was formed to have Plaintiff return to work, audit/review her schedule two weeks in advance to confirm that the workload was comfortable for her, and alert the company if any physical issues come up.  Once again, Defendants promised Ms. Jacobson she would have an assistant (which is standard protocol anyway) and only have to work one column so she could build her way up to two columns.

55.    That plan was then thwarted by InterDent's corporate team.

56.    On October 11, 2023, InterDent's Human Resources Director Christopher Alves emailed the management team, refusing to refer to Plaintiff by name (completely de-humanizing her)

and (incorrectly) stating the following:  Team member should have a normal patient schedule. Restrictions are meant to aid a team member in performing their full role."

57.    This is not accurate.  The point of accommodations is to enable an employee to perform the essential functions of their job.  Plaintiff could physically perform all of her essential hygienist duties *with* the accommodated help of a dental assistant performing non-hygienist essential tasks such as adjusting the light, opening draws, etc. Defendants just did not want to provide that – not for any legitimate hardship reasons, but because they wanted to save money and push Plaintiff out.

58.    Plaintiff explained via text message to Megan Alapati that if no assistant is provided to her, then she is forced to take on the role of hygienist and assistant as far as workload, meaning she would be punished because she needed medical restrictions.

59.    On or about October 11, 2023, Megan Alpati emailed management stating, "Betty schedule Rachell 2 columns as discussed."

60.    The situation was not tenable and was further aggravating and worsening Plaintiff's medical condition.  As such, Ms. Jacobson was forced to leave the InterDent workplace on November 5, 2023, stating in her constructive discharge letter that "I have seen them dispose and devalue so many amazing people and they have shown me that I am just as disregarded."

61.    This entire ordeal of being discriminated and retaliated against due to her need for reasonable accommodations has caused immense emotional distress to Plaintiff, which has manifested itself in the form of anxiety, depression, increased chest pains, and panic attacks.

## FIRST CLAIM FOR RELIEF

**Violation of Title I of the Americans with Disabilities Act of 1990 and the ADA Amendments Act of 2008; 42 U.S.C § 12101 *et seq*.**

**(Disability Discrimination)**

62.    Plaintiff repeats and re-alleges the allegations of the preceding paragraphs of the complaint as though fully set forth herein and incorporates the same herein by reference.

63.    While employed with Defendants, Plaintiff suffered from physical impairments specifically related to injuries to her left elbow and arm, the flare-ups of which caused her to experience a wide variety of physically impairing symptoms which substantially limited major life

10

activities, including but not limited to: limited movement, pain, inability to lift objects heavier than ten pounds, inability to raise her arm fully above her shoulder, and a lower capacity for strenuous duty.  Thus, her physical situation resulted in a disability.

64.    Plaintiff's impairments substantially limited her major life activities and ability to work under normal circumstances, including but not limited to the ability to lift heavy objects, fully moving her arm above her shoulder, reaching for items, all of which are requirements of Ms. Jacobson's job as a dental hygienist.

65.    Plaintiff was open and forthcoming about her medical limitations to Defendants, as she diligently provided ADA accommodation paperwork as requested by Defendants.

66.    However, Plaintiff was otherwise qualified to perform the essential functions of her job as long as she had reasonable accommodations from Defendants, which included a modified work schedule and an assistant.

67.    Plaintiff cooperated with providing the medical ADA accommodation paperwork to Defendants but instead of Defendants cooperating with the accommodations, Plaintiff was met with open disdain and obstruction from the company.

68.    Defendants obstructed and effectively refused to abide by Plaintiff's reasonable accommodation agreement (for a modified work schedule and assistant), even though these accommodations were placed in writing by a manager for Plaintiff.

69.    Defendants subjected Plaintiff to adverse actions, including but not limited to: refusing to provide an assistant for her shifts after promising to do so; refusing to allow Plaintiff to work one column instead of two columns; and constructive discharge due to refusing to accommodate Plaintiff's worsening and aggravated medical condition.

70.    Plaintiff suffered adverse employment actions (including arbitrary and punishing changes to her schedule and the lack of any support system unlike other dental hygienists) because of her disability. Defendants treated Plaintiff adversely because of her disability and effectively punished her because of her disability by (amongst other things mentioned herein): forcing her to continue to work her normal patient load by herself regardless of her medical condition, even though other dental hygienists without medical accommodations regularly work with assistants..

71.    In doing the acts and omissions alleged herein, Defendants knew or should have known that their conduct was directed to a person with a disability, thereby entitling Plaintiff to recover all damages, penalties, and/or other such remedies pursuant to federal law.

72.    Defendants' actions were taken with malice and/or with reckless indifference to Plaintiff's federally protected rights.

73.    As a result of Defendants' actions, Plaintiff has suffered lost wages, mental anguish, emotional distress, inconvenience and loss of enjoyment of life.

74.    Plaintiff is entitled to recover compensatory damages due to the Defendants engaging in unlawful disability discrimination.

75.    Plaintiff is entitled to recover her attorneys' fees and costs incurred in litigating this matter.

<u>**SECOND CLAIM FOR RELIEF**</u>

**Violation of Title V of the Americans with Disabilities Act of 1990 and the ADA Amendments Act of 2008; 42 U.S.C § 12101 *et seq*.**

**(Retaliation)**

76.    Plaintiff repeats and realleges the allegations of the preceding paragraphs of the complaint as though fully set forth herein and incorporates the same herein by reference.

77.    Plaintiff engaged in protected employee activity by requesting an accommodation for her medical condition.

78.    Specifically, Plaintiff reasonably requested an assistant to help perform nonhygienic functions and a limited workload to start, which was substantiated by paperwork submitted by her medical provider.

79.    Defendants effectively retaliated against Plaintiff and subjected Plaintiff to a retaliatory hostile work environment by subjecting her to the following adverse actions: refusing to provide an assistant after promising to do so; refusing to allow Plaintiff to take mandatory rest breaks on many shifts; prohibiting Plaintiff from clocking in until 7:45 a.m., and refusing to limit her workload to one column after promising to do so.

80.    The timing of Defendants' adverse actions establishes a causal connection between

Plaintiff's protected activity and the adverse actions referenced above.

81. But for Plaintiff's medical condition and her exercise of protected action, and the Defendant's harassing and hostile response to it, Plaintiff would never have felt forced to leave her position.

82. In doing the acts and omissions alleged herein, Defendants knew or should have known that their conduct was directed to a person with a disability, thereby entitling Plaintiff to recover all damages, penalties, and/or other such remedies pursuant to federal law.

83. Defendants' actions were taken with malice and/or with reckless indifference to Plaintiff's federally protected rights.

84. As a result of Defendants' actions, Plaintiff has suffered lost wages, an aggravated medical condition and pain, mental anguish, emotional distress, inconvenience and loss of enjoyment of life.

85. Plaintiff is entitled to recover compensatory damages due to Defendants engaging in unlawful disability retaliation.

86. Plaintiff is entitled to recover her attorneys' fees and costs incurred in litigating this matter.

### THIRD CLAIM FOR RELIEF

**Violation of NRS 613.330 – Disability Discrimination**

87. Plaintiff repeats and re-alleges the allegations of the preceding paragraphs of the complaint as though fully set forth herein and incorporates the same herein by reference.

88. Defendants discriminated against Plaintiff by: refusing to work with her on workplace accommodations; refusing to provide her with an assistant after promising to do so; refusing to allow Plaintiff to take mandatory rest breaks on many shifts; and refusing to limit her workload to one column after promising to do so.

89. As a result of Defendant's actions, Plaintiff has suffered lost wages, mental anguish, emotional distress, inconvenience and loss of enjoyment of life.

90. Defendant's discrimination deprived Plaintiff of employment opportunities and adversely affected her status as an employee.

13

91.     Plaintiff is entitled to recover her attorneys' fees and costs incurred in litigating this matter.

### FOURTH CLAIM FOR RELIEF

**VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT OF 1992, 29 U.S.C. § 2615(A)(2) –**

**UNLAWFUL RETALIATION**

92.     Plaintiff repeats and re-alleges the allegations of the preceding paragraphs of the complaint as though fully set forth herein and incorporates the same herein by reference.

93.     Plaintiff engaged in protected activity by taking FMLA leave for certain days throughout June – September 2023.

94.     Plaintiff was subjected to adverse treatment in violation of her FMLA rights by way of being harassed immediately after she returned from FMLA leave and sought reasonable medical accommodations, and this adverse treatment ultimately served as retaliation for Plaintiff taking intermittent FMLA leave.

95.     Defendants' actions in refusing to provide Plaintiff with an assistant, refusing to limit Plaintiff's workload, and blocking Plaintiff from actually taking breaks, all constitute actions that a reasonable employee would have found materially adverse, and Plaintiff did in fact find them to be adverse.

96.     There exists a causal connection between Plaintiff using FMLA leave in June – September 2023 and the adverse actions that Defendants imposed on her shortly thereafter.

97.     As a proximate cause of Defendants' conduct, Plaintiff has incurred emotional distress, lost income, and lost financial and medical benefits.

98.     In violating the FMLA, Defendants did not act in good faith, nor did they base their actions on reasonable grounds.

99.     As a result of Defendants' illegal conduct, Defendants are liable for economic damages, liquidated damages, and equitable relief in the form of reinstatement or front pay, as the court deems appropriate, pursuant to 29 U.S.C. § 2617(a)(1)(B).

100.    As a result of Defendants' illegal conduct, it has been necessary for Plaintiff to retain the services of attorneys, and pursuant to 29 U.S.C. § 2617(a), she is entitled to recover reasonable

costs and attorneys' fees.

## DEMAND FOR JURY TRIAL

1.    Pursuant to the Seventh Amendment of the United States Constitution, Plaintiffs invoke their right to trial by jury in this civil action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff RACHELL A. JACOBSON prays for judgment against Defendants, and each of them, as follows:

1.    For a judgment in favor of Plaintiff against Defendants, and each of them, on the complaint and all claims for relief asserted therein;

2.    For an award of economic damages in an amount sufficient to make Plaintiff whole for past and future lost income and benefits and other economic losses suffered by Plaintiff resulting from Defendants' conduct;

3.    For an award of compensatory damages from mental anguish, emotional distress, pain and suffering, humiliation, harm to reputation, and other losses incurred by Plaintiff as a result of Defendants' conduct;

4.    For injunctive relief in the form of reinstatement to their job positions with appropriate corrective measures put in place to ensure Defendants will no longer violate anti-discrimination laws;

5.    For an award of prejudgment and post-judgment interest;

6.    For an award of punitive damages;

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

15

7.    For an award of attorney's fees, costs, and related expenses pursuant to § 706(k) of Title VII, 42 U.S.C. § 2000e-5(k) and other corresponding federal and state law; and

8.    For an award of such other relief the Court may deem just and proper.

DATED this 19th day of June 2025.

Respectfully submitted,

**MAIER GUTIERREZ & ASSOCIATES**


*/s/ Danielle J. Barraza*
JASON R. MAIER, ESQ.
Nevada Bar No. 8557
DANIELLE J. BARRAZA, ESQ.
Nevada Bar No. 13822
8816 Spanish Ridge Avenue
Las Vegas, Nevada 89148
*Attorneys for Plaintiffs*